FILED
11/21/2022
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

YOLANDA ADAMS, DBA GERIATRIC
CARE HOME LLC, A LICENSED
WASHINGTON ADULT FAMILY HOME,

Appellant,

v.

WASHINGTON STATE DEPARTMENT
OF SOCIAL AND HEALTH SERVICES,

Respondent.

No. 84245-5-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. —   Connie, a vulnerable adult with a history of dementia and exit-seeking behaviors, left her care facility for three hours before her caregiver, Yolanda Adams, noticed and eventually found her.  The Adult Protective Services (APS) division of the Department of Social and Health Services (Department) conducted an investigation and determined that Adams neglected Connie.  Adams appealed and an administrative law judge (ALJ) reversed.  The Department appealed and the Department's Board of Appeals (Board) reversed the ALJ.  The superior court affirmed.  Adams now appeals to this court. Because substantial evidence supports the Board's findings and the Board, other than relying on a former version of RCW 74.34.020, did not otherwise misapply the law to the prejudice of Adams, we affirm.

 Citations and pincites are based on the Westlaw online version of the cited material

FACTS

On January 25, 2018, Connie,[1] born in 1950, was admitted into Geriatric Care Home (GCH), an adult family home run by Yolanda Adams. Connie was diagnosed with depression, memory loss, dementia, osteoporosis, anemia, failure to thrive, a traumatic brain injury, anxiety, and vertigo. GCH is licensed to house six residents at any given point. GCH employed Adams' daughter, Janelle Ibarreta, and Adams' niece. Adams' husband also assisted with care of GCH residents on a daily basis.

GCH is all on one floor with three bathrooms, an office, two bedrooms, a kitchen, and a living room. There are two doors—one front door, and one back door that leads to a fenced-in backyard.

On the day she was admitted, Adams began writing a Negotiated Care Plan (NCP) for Connie. It listed Connie's care needs and GCH's plans for addressing those needs. The NCP is a living document that Adams updated over time as Connie's care needs changed. Nancy Capretto, Connie's Home and Community Services Case Manager, reviewed and signed the NCP on February 25.

An NCP dated March 14, 2018 documented several behaviors displayed by Connie, including short-term and long-term memory impairment, anxiety, depression, hallucinations, disorientation, wandering in home, and exit-seeking behavior. The NCP also noted her dementia, "[p]oor decisions/unaware of consequences" and that she gets disoriented and easily confused.

---

[1] Because Connie is a vulnerable adult, we refer to her by her first name.

The NCP also listed what the caregiver will do. The list included "[a]lways keep an eye on her. Total care is needed."[2]

On March 15, Connie tried to leave the home and told Adams she wanted to go alone.

On March 23, Capretto conducted a significant change assessment of Connie based on Adams' request. Significant change assessments are meant to assess the client's current condition, necessary services, medications, and care planning. The purpose of the change assessment is to determine the reimbursement rate for a provider, for providing care to a client, and also to communicate with the provider in order for the provider to update the NCP.

Capretto noted, among other observations, that Connie makes poor decisions and is unaware of consequences due to her dementia and confusion. She also noted that Connie exhibits "wanders/exit seeking" on a "daily" basis and that Connie is "[n]ot easily altered" from this behavior. Additionally, in regard to "Locomotion outside of Immediate Living Environment to include Outdoors," Connie's ability fluctuated. The assessment noted that Connie "may stumble when walking" and needed assistance with stairs. Capretto testified that the Department classified Connie as requiring a higher level of care. Capretto did not believe that Connie should be allowed to walk outside alone because of her dementia. Capretto personally observed Connie walking and noted that she was

---

[2] Adams added hand-written notes on the March 14 NCP after the July 18 elopement event at issue in this case. Those notes added "walked away from home" to the list of exhibited behaviors. Adams also added actions by the caregiver: "alarms on at night," "family provided ID bracelet," "take her for a supervised walk," and "check her every hour."

unsteady, but she did not fall.

On April 1, Connie told Adams she wanted to walk alone and got agitated when Adams tried to walk with her or follow her. On July 11, Connie was upset that she could not walk outside because of the hot weather. Adams noted that Connie, yelled, "I know what's good for me . . . and walked out." After Connie walked out, Adams followed. Ibarreta testified that when Connie would exhibit exit-seeking behavior, she would have a "distinct, like, upset face" and would "pace around" and mumble, saying she wanted to go home with her daughter. Adams put up signs on the inside of Connie's bedroom door and on the inside of the home's main door that informed Connie to let someone know if she was going to go walking outside.

On July 18, Adams described Connie as having a "good day," meaning that Connie had not been upset that day or exhibited any disruptive behaviors. Adams testified that if Connie was having a bad day, she would check on her in the afternoons. If she was having a good day, she would let her "rest in her room." That means unless Connie required medication, which would be administered at 2:00 p.m., the next time Adams would check on Connie after lunch would be at 3:30 p.m., when caregivers would check on residents to see what they wanted to eat for dinner.

That same day, Adams observed Connie in the fenced-in backyard while Adams was cleaning the dishes from lunch at 12:00 p.m. Connie could access the backyard alone at her leisure.

Lori Rotherham, GCH's neighbor, saw Connie walking on a sidewalk

4

around 1:00 p.m. when another neighbor brought her over, because Connie was lost. Rotherham started speaking to her and felt "it was pretty clear right away that she was indeed lost." Although Connie was able to effectively communicate, she only knew her first name and did not remember her address. Connie told Rotherham that she did not know where she was and that she was 35-years-old. She was not wearing an identification bracelet.

Connie did not appear injured, but she was nervous and frustrated that she could not recall her name. The neighbor then decided to call 911 because she felt Connie needed assistance that she could not provide. At 1:11 p.m., the police department dispatched Corporal Ray Reynolds to check on Connie. When he approached Connie, he observed that she began crying. Reynolds testified that Connie's confusion was extremely obvious, and she was unable to give her last name or date of birth. He called multiple hospitals and adult care facilities in the area and decided that she should be transported to PeaceHealth.[3]

At around 2:00 p.m. that day, Adams visited Connie's room to administer medications to Connie's roommate; Connie was not scheduled to receive medications at that time. Adams did not see Connie in her room at that time.

Around 3:30 p.m., Adams noticed that Connie was missing. She called her husband and asked him to search for her. Adams could not search for Connie because she had to look after the other residents. Adams' husband looked for Connie for about 20 to 30 minutes before deciding to check if Connie was at PeaceHealth emergency room and found her there. Adams called 911

---

[3] PeaceHealth is a hospital six blocks south of GCH.

between 4:00 p.m. and 4:30 p.m. to report Connie's elopement.

On February 15, 2019, APS notified Adams that based on its investigation, it determined that Adams neglected a vulnerable adult (Connie). APS determined that the facts met the definition of neglect per Former RCW 74.34.020(16)(a) and (b) (2018):

> "Neglect" (a) a pattern of conduct or inaction by a person or entity with a duty of care that fails to provide the goods and services that maintain physical or mental health of a vulnerable adult, or that fails to avoid or prevent physical or mental harm or pain to a vulnerable adult; or (b) an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

Adams then requested an administrative hearing from the Office of Administrative Hearings (OAH), and the OAH issued an initial order. The Administrative Law Judge (ALJ) concluded that Adams did not neglect Connie and reversed the Department's initial finding of neglect.

The ALJ determined that under RCW 74.34.020(16)(b) (2018), Adams did not demonstrate a serious disregard of consequences for Connie because the NCP merely required that caregivers "always keep an eye on her," and the Department did not contend that Connie's care plan required 24-hour "line of sight" supervision. The ALJ reasoned:

> As soon as [Adams] discovered that Connie was missing from Geriatric Care Home, she called [her husband] who immediately began searching for her at [the park]. It was [Adams], who within an hour of noticing Connie's absence correctly surmised that Connie was at the PeaceHealth emergency department and directed [her husband] to go there. She waited approximately an hour to call 911 because she was busy taking care of the other residents in the home and cooperating with [her husband] on the

6

search for Connie. These are reasonable responses and do not rise to the level of a "serious disregard" for Connie's welfare.

The ALJ also determined that the Department failed to prove by a preponderance of the evidence that Connie was in "clear and present danger" on the day of the incident.

The Department requested review by the Board, which issued a review decision and final order reversing the initial order and affirming the Department's initial determination that Adams neglected a vulnerable adult. It reasoned that Adams failed to follow Connie's NCP to "[a]lways keep an eye on her. Total care is needed" because Adams had failed to supervise Connie from 12:30 p.m. through 3:30 p.m. and did not call the police immediately when she knew Connie was missing. It concluded that Adams' failure to follow the NCP and provide Connie with adequate supervision necessary to keep her from eloping from GCH demonstrated a serious disregard of potential consequences to Connie's health and welfare because she knew Connie had a history of eloping and that Connie would elope if her NCP was not followed, but Adams still failed to periodically check on Connie's whereabouts. It determined that it was reasonable to conclude that Connie would be at risk of physical or emotional injury while being alone for over three hours as evidence by her apparent fear, confusion, frustration, and anxiety.

On April 6, 2020, Adams filed a motion for stay of final order and motion for reconsideration of review decision and final order, arguing that there was no substantial evidence to support a finding of neglect because there was no evidence that Connie had to have one-on-one care, 24-hours a day.

7

On April 23, the Board issued a review decision and final order on reconsideration. It modified some findings per Adams' motion[4] but affirmed the Department's determination that Adams neglected a vulnerable adult and denied Adams' motion for stay. Clark County Superior Court affirmed. Adams appeals.

DISCUSSION

The Administrative Procedure Act (APA), ch. 34.05 RCW, governs our review of the Board's decision. Gradinaru v. Dep't of Soc. & Health Servs., 181 Wn. App. 18, 21, 325 P.3d 209 (2014). Under RCW 34.05.570(1)(a), "[t]he burden of demonstrating the invalidity of agency action is on the party asserting invalidity." We will only grant relief if we determine that Adams has been substantially prejudiced by the agency action. RCW 34.05.570(1)(d). We may reverse if the agency has erroneously interpreted or applied the law; if the order is not supported by substantial evidence when viewed in light of the record before the court, which includes the agency record for judicial review; or if the order is arbitrary and capricious. RCW 34.05.570(3)(d), (e), (i).

In reviewing the Board's decision, we sit in the same position as the superior court and apply the proper standard of review directly to the record of the administrative proceedings, not to the findings and conclusions of the superior court. Life Care Centers of Am., Inc. v. Dep't of Soc. and Health Servs., 162 Wn. App. 370, 374, 254 P.3d 919 (2011) (citing Utter v. State, Dep't of Soc. & Health Servs., 140 Wn. App. 293, 299, 165 P.3d 399 (2007)); D.W. Close Co.,

---

[4] Instead of finding that Adams knew Connie had a history of eloping, the final order found Adams knew that Connie had a history of wandering and exit-seeking behaviors.

8

Inc. v. Dep't of Labor and Indus., 143 Wn. App. 118, 125, 177 P.3d 143 (2008).

Unchallenged factual findings are verities on appeal. Life Care Centers, 162 Wn.

App. at 374.

Substantial Evidence

Adams contends substantial evidence does not support the Board's findings

of fact 24 and 74. We disagree.

We review the Board's factual findings for substantial evidence, asking

whether the record contains evidence sufficient to convince a rational, fair-

minded person that the finding is true. RCW 34.05.570(3)(e); Woldemicael v.

Dep't of Soc. & Health Servs., 19 Wn. App. 2d 178, 184, 494 P.3d 1100 (2021)

(published in part) (citing Pac. Coast Shredding, L.L.C. v. Port of Vancouver,

USA, 14 Wn. App. 2d 484, 501, 471 P.3d 934, 945 (2020)). "We do not reweigh

evidence or judge witness credibility, but instead, defer to the agency's broad

discretion in weighing the evidence." Woldemicael, No. 54220-0-II, slip op.

(unpublished portion) at 16,

https://www.courts.wa.gov/opinions/pdf/D2%2054220-0-

II%20Published%20Opinion.pdf.

Adams first challenges the Board's finding of fact 24, which provides the

following:

> [Adams] prepared breakfast for Connie and the other five (5)
> residents that morning. Around 12:30 p.m. on July 18, 2018,
> [Adams] observed Connie in the backyard while [Adams] was
> cleaning the dishes from lunch. Around 2:00 p.m., [Adams] went to
> Connie's room to administer medications to Connie's roommate.
> Connie was not scheduled to receive medications at that time.
> [Adams] did not see Connie in her room at that time. Although,
> Connie's NCP required that her caregiver, "*Always keep an eye on*

*her. Total care is needed,*" [Adams] did not look for Connie.

Adams also challenges the Board's finding of fact 74, which provides,

> Soon after Connie moved into *Geriatric Care Home*, [Adams] contacted [Capretto] to request a new assessment, because Connie required more care than [Adams] was being compensated for. She was exhibiting crying/tearful behaviors and was easily agitated. In the NCP, [Capretto] noted that Connie's caregivers should *"(a)lways keep an eye on her. Total care is needed.*" Adult family homes are not allowed to lock the doors of their homes.

It appears Adams' main contentions with these findings of fact are that Adams was not required to provide around the clock one-on-one supervision of Connie, and she was only required to provide more supervision when she was having a "bad day" and displaying disruptive behaviors or being upset. However, these findings of fact are simply quoting the language contained in Connie's NCP, which Adams wrote herself. The NCP does not provide and the Board did not find that Adams was required to have Connie within her line of sight 24-hours a day as Adams purports. Substantial evidence supports these findings.

Adams also contends that the Board's conclusion that she neglected a vulnerable adult was an error of law.[5] We disagree.

Under RCW 34.05.570(3)(d), we may grant relief from final agency action when "[t]he agency has erroneously interpreted or applied the law." Woldemicael, 19 Wn. App. 2d at 181-82. We review such a contention de novo, but we "give substantial weight to [the agency's] interpretation of the law when

---

[5] Adams also contends without making any other substantive argument that the Board and superior court's decision were arbitrary and capricious. "This court will not consider claims insufficiently argued by the parties." State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990).

subjects fall within [the agency's] area of expertise." Id. (alteration in original) (citing Pac. Coast Shredding, 14 Wn. App. 2d at 502)).

To prove neglect under RCW 74.34.020(15)(b),[6] the Department was required to prove by a preponderance of the evidence:

> an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

As a preliminary matter, it appears the Board referenced Former RCW 74.34.020(12)(b) (2012), which did not have the "duty of care" language in the statute, instead of the applicable RCW 74.34.020(16)(b) (2018). In 2013, the legislature added the "duty of care" language requirement to the definition of neglect in Former RCW 74.34.020(12)(b) (2013). S.B. 5510, 63rd Leg., Reg. Sess. (Wash. 2013). However, neither party raises this issue nor is it disputed that Adams was Connie's caregiver, a vulnerable adult, and Adams therefore had a duty of care to Connie. Thus, the Board's error did not substantially prejudice Connie.

The Board properly recognized that the neglect required the act or omission to demonstrate "a serious disregard of consequences." The Board then concluded:

> 15. [Adams'] negligent action(s) occurred from 12:30 p.m., through 3:30 p.m., on July 18, 2018, when [Adams] failed to provide Connie with the adequate supervision necessary to keep Connie

---

[6] We note that RCW 74.34.020(16)(b) (2018), which was effective in July 2018, is the applicable statute in this case because the incident occurred on July 18, 2018. However, because the relevant language in the 2018 statute is identical to the current version of the statute, we cite to the current version.

11

from eloping from her adult family home. Specifically, [Adams] failed to follow Connie's NCP and "*Always keep an eye on her. Total care is needed,*" *as written by [Adams].* From 12:30 p.m., through 3:30 p.m., on July 18, 2018, [Adams] failed to supervise Connie, and had no idea where Connie was, or what she was doing. Furthermore, [Adams] irresponsible actions were compounded, when she failed to notify 911 immediately, once she realized Connie was missing, thereby further delaying Connie's recovery and return to the adult family home.

16. [Adams] failure to both follow Connie's NCP, and to provide Connie with the adequate supervision necessary to keep her from eloping from her adult family home, demonstrated a serious disregard of potential consequences to Connie's health and welfare. [Adams] knew that Connie had a history of wandering and exit seeking behaviors. [Adams] was also aware that since March 2018, Connie's NCP required that her caregiver "*Always keep an eye on her. Total care is needed,*" and [Adams] herself had negotiated a payment of more money to provide Connie this extra attention. Although, [Adams] knew that Connie would seek an exit and could wander off if her NCP was not followed, [Adams] still failed to follow Connie's NCP and periodically check on Connie [sic] whereabouts. Additionally, [Adams] knew that Connie suffered from dementia, had long and short term memory issues, made poor decisions, was easily agitated and disoriented, and Connie's ability to walk outdoors fluctuated and she was at risk for falling. In spite of this knowledge, [Adams] failed to supervise Connie, and failed to check on Connie at any time between 12:30 p.m. and 3:30 p.m. on July 18, 2018. Based on [Adams'] knowledge at the time of the incident, these actions demonstrated a serious disregard of potential consequences to Connie's health and welfare.

Other than what we have already addressed above, Adams does not dispute the underlying factual bases for the Board's conclusions, which are supported by substantial evidence. She instead focuses on the fact that she was not required to provide one-on-one supervision care 24/7 and that such care was required to prevent elopement. Adams cites to the testimony of DSHS investigator Shawn Swanstrom. Swanstrom testified that elopement is a category of exit-seeking wandering. "[E]xit seeking means that people are looking for the door, but don't always exit. If someone has actually left the home,

the term elopement is used." Swanstrom also testified that in order to prevent elopement, the caregiver must provide "one-on-one care" "24/7," which was not required for Connie at the time of elopement.

Adams misconstrues the Board's ruling. The Board did not rule that the neglect was failing to provide one-on-one care 24/7 for Connie. The Board's ruling was based on the fact that Adams did not check on Connie for three hours, which led to the elopement, and delayed calling 911 when Adams knew Connie had exhibited exit-seeking behavior, suffered from dementia and memory issues, made poor decisions, was easily agitated and disoriented, and that she was at risk for falling. While it is true that Adams did not have a prescribed frequency as to when she was required to check on Connie, Adams recognized that she should "always keep an eye on her" and "total care [was] needed." In fact, Adams knew Connie tried to exit the home on March 15, 2018, and did leave the home on April 1, 2018 and July 11, 2018, though Adams followed her.

Adams also claims that the NCP's direction to observe Connie more frequently than her normal routine only applied when Connie displayed known behaviors listed in the NCP, such as being disruptive. Adams argues that because Connie was having what appeared to be a good day on July 18, 2018, nothing warranted actions different from the normal routine, which meant checking in on her at 3:30 p.m. after lunch. Thus, Adams argues she did not exhibit a serious disregard of consequences for not checking on Connie between lunch and 3:30 p.m. However, the March 23 assessment noted that Connie's exit-seeking/wandering behavior was a "daily" occurrence. Nothing in the record

13

establishes that the only times Connie tried to exit the home was when she displayed disruptive behavior prior to lunch.

Substantial evidence supported the Board's conclusion that Adams had a duty not to wait three hours to check on Connie, and the delay in calling 911 amounted to neglect under the facts of this case.

Adams next argues that her omission did not cause a clear and present danger. Adams contends, without citing to any authority, that because Connie was found by a neighbor in a quiet residential neighborhood uninjured, the Department did not meet its burden of establishing that Connie "was actually in imminent and clear danger."

RCW 74.34.020(15)(b) does not require the Department to prove Connie was in "imminent" and clear danger, it requires the Department to establish that the serious disregard of consequences was of "such a magnitude as to constitute a clear and *present* danger to the vulnerable adult's health, welfare, or safety." RCW 74.34.020(15)(b) (emphasis added). In addition to her dementia and confusion, Connie could not walk outside by herself because her ability to do so fluctuated and that she "may stumble when walking." Adams herself testified that she would not let Connie go out of the house by herself. Substantial evidence supports the Board's conclusion that Connie's inaction demonstrated a serious disregard of consequences of such magnitude as to constitute a clear and present danger to Connie's health, welfare, or safety.

We do not grant Adams' request for attorney fees under RCW 4.84.350 because she did not prevail in this review of an agency action.

We affirm.

_Coburn, J._

WE CONCUR:

_Díaz, J._                    _Smith, A.C.J._